# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

RUTH MOSHOLDER,

        Plaintiffs,

v.                                    Case No. 09-CV-11829-DT

PATRICIA BARNHARDT, et al.,

        Defendant.

_____/

## OPINION AND ORDER DENYING DEFENDANTS' "MOTION TO DISMISS AND/OR FOR SUMMARY JUDGMENT"

Pending before the court is a "Motion to Dismiss and/or [for] Summary Judgment," filed by Defendants Patricia Barnhardt and Dewayne Burton on December 9, 2009.[1] Plaintiff Ruth Mosholder filed a response to the motion, and the court

---

[1] Neither party adhered adequately to this court's motion practice guidelines, as set forth in the court's June 18, 2009 "Scheduling Order," and submitted briefs in formats which are contrary to the preferred format in this district and by this judge. The parties simply ignored this court's instructions with respect to Rule 56 motions. Neither party provided numbered, corresponding statements of purportedly uncontroverted facts. Defendant's first stated fact is "Plaintiff works a [sic] Corrections Officer E-9 in the Thumb Correctional Facility (TCF). (Exhibit A, Plaintiff's Deposition, p 20 ln 5-19)." Plaintiff's first stated fact is "Plaintiff was hired by the MDOC in February 1995 and was initially posted at the Western Wayne Correctional Facility. See Exhibit 1, pg. 10." The result of the parties' failure to coordinate is a jumble of alleged facts coming from two directions many of which are either uncontested or irrelevant to the decision.

Plaintiff's brief contains margins much smaller than the size mandated by Local Rule 5.1, making the brief more difficult to read. Defendants, for their part, followed what appears to be an Attorney General's office trend, citing every authority in a footnote. This practice is distracting to a reader and unacceptable to this judge. The Attorney General is notified that future filings in this judge's cases that confine case and statutory citations to footnotes will be stricken subject to refiling. Assistant Attorneys General Grill and Cabadas are directed to notify their supervisor(s) in writing of this point of procedure. The court, on the other hand, commends both the Attorney General and Plaintiffs for clarity in docketing of supporting exhibits (e.g., " Exhibit A - Deposition of Ruth Mosholder 10 pages; Exhibit B - Deposition of Laquita Featherstone 6 pages,"

concludes a hearing is unnecessary. *See* E.D. Mich. LR 7.1(e)(2). For the reasons stated below, the court will deny the motion.

## I. INTRODUCTION

On or about April 20, 2009, Plaintiff initiated this action in Genesee County Circuit Court. Plaintiff asserted one count against Defendant Barnhardt under 42 U.S.C. § 1983, and one count against Defendant Burton under 42 U.S.C. § 1983. Both counts allege that Defendants retaliated against her for exercising her free speech rights under the First Amendment of the Constitution. Defendants timely removed the action to this court on May 12, 2009, and the case proceeded through discovery. Defendants now assert that Plaintiff's case cannot survive summary judgment because as a matter of law she cannot establish either (1) an adverse action or (2) a causal connection between the adverse action and the alleged protected activity. Because the court finds that a reasonable jury could find that Plaintiff can establish her prima facie case, the court will deny Defendants' motion.

## II. BACKGROUND

Plaintiff began working for the Michigan Department of Corrections ("MDOC") in February 1995. (Pl.'s Dep. at 10, Pl.'s Ex. 1.) After working at several other facilities, Plaintiff was transferred to the Thumb Correctional Facility ("TCF") in Lapeer, Michigan in February of 2001. (*Id.* at 20.) Plaintiff's position at TCF was a Corrections Officer E-9. (*Id.*) She worked mostly outside in the yard, but also in the housing unit. She worked different positions, including the front desk and the visiting room, wherever she

_____

etc.), a format that is also called for in CM/ECF guidelines, but too seldom followed.

was needed.  (*Id.*)  The shift command at TCF has the right to assign correction officers on various details, as needed.  (*Id.* at 27.)  Plaintiff worked the afternoon shift at TCF, which is 2:00 p.m. to 10:00 p.m.  (*Id.* at 20-21.)

Plaintiff became a school officer at TCF in September 2001.  (*Id.* at 25.)  The school officer is a bid position.  (*Id.*)  Interested employees submit their names for consideration, and the three employees with the highest seniority are considered for the position.  (*Id.* at 26.)  Plaintiff had the third highest seniority, but after the interviews she was selected for the position.  (*Id.*)  As a bid assignment, the school officer's assignments do not change daily; the school officer is guaranteed the same assignment every day.  (*Id.* at 27)  Additionally, the school officer has a set schedule, with weekends and holidays off.  (*Id.*)  Indeed, the school officer position is the only second shift position at TCF with regular weekends and holidays off.  (*Id.* at 153-54.)  The school officer's interaction with the inmates is limited.  According to Plaintiff, corrections officers at TCF generally supervise 800 to 1200 prisoners, but the school officer is charged with forty to eighty prisoners at any given time.  (*Id.* at 27)  Plaintiff also testified that the school officer position is less hazardous and less dangerous than being a corrections officer in the general population.  (*Id.* at 154.)  Aside from these differences, though, the school officer is nonetheless still a corrections officer, with the same rank and grade. (*Id.* at 28.)

Plaintiff worked as the school officer until she was transferred to a regular TCF corrections officer position in February 2009.  The events leading up to the transfer form the basis of Plaintiff's retaliation lawsuit.

In the summer of 2008, Defendant Burton developed the idea of having a rap competition at TCF. (Pl.'s Ex. 3, Burton Dep. at 10-11.) The competition occurred on October 3, 2008, as part of a program with Kettering University. (*Id.* at 20-21.) The winner of the contest would have his presentation aired on Kettering's radio station. (*Id.* at 17.) According to Burton, the participants submitted their lyrics before the competition and they were reviewed and censored. (*Id.* at 26.) While the participants performed their songs, Defendant Burton read their submissions to make sure they were following the approved lyrics. (*Id.*) One participant used profanity, and his song was immediately ended. (*Id.* at 27.) Burton did not see any use of gang signs. (*Id.* at 31.)

Plaintiff testified that she did not observe the entire rap competition, but went down to watch it three or four times, each time spending about five minutes. (Pl.'s Mot. Br. at Ex. 1, Pl.'s Dep. at 70.) Plaintiff testified that she saw inmates flashing gang signs and singing lyrics about groups (313 and Joy Road), which are not officially recognized as gangs, but to "those of us that work in prison" the groups are "like street gangs." (*Id.* at 71.) She also saw inmates who were in violation of the dress code, with their pants pulled down, their shirts hanging out, and wearing hats. (*Id.* at 74.) Plaintiff testified that she and other officers believed it to be a potentially volatile situation. (*Id.* at 88-90.)

Following the competition, Plaintiff did not report any violations to her superiors because she had reported violations in the past which she claims were covered up. (*Id.* at 77.) Instead, she wrote letters on October 10, 2008, to various state legislators, including, at least, Michigan Senators Jim Barcia and John Gleason and Michigan

House of Representatives Terry Brown, Lee Gonzales, and John Stahl. (*Id.* at 79.) She believes that Senator Barcia forwarded her letter to Senator Judson Gilbert, II. (*Id.*) Plaintiff has submitted two of these letters, which appear to be identical, to the court. (Pl.'s Ex. 18.) In the letters, Plaintiff expresses her view that the rap competition was, essentially, ill-advised. She describes the policy violations she observed, as well as described the general atmosphere as "a very volatile situation that was on the edge of exploding." (*Id.*)

On October 21, 2008, the legislative assistant to Representative Gonzales emailed Bryan Crenshaw, the legislative liaison for the Michigan Department of Corrections, about Plaintiff's letter to Representative Gonzales. (Pl.'s Ex. 19.) Crenshaw immediately emailed Defendant Barnhardt, stating: "Can anyone shed some light on this[?] I received a copy of the same letter in the mail yesterday from a legislative office, so it appears the staff person has contacted multiple legislators." (Pl.'s Ex. 20.) Defendant Barnhardt responded that she would put together a written response after talking to Defendant Burton. (*Id.*)

Defendant Burton testified that Defendant Barnhardt gave him a copy of the letter and asked him to put a report together on the rap competition and the actual events that took place. (Pl.'s Ex. 3, Burton Dep. at 24.) Defendant Barnhardt testified that when she spoke with Defendant Burton about Plaintiff's letter, he seemed "absolutely" concerned. (Pl.'s Ex. 4, Barnhardt Dep. at 71.) On October 22, 2008, Defendant Burton sent a memorandum to Defendant Barnhardt outlining his view of the October 3, 2008 rap competition, and his disagreement with the issues raised in Plaintiff's letter. (Pl.'s Ex. 23.

On October 24, 2008, Defendant Barnhardt provided a written response to Representative Gonzales's office regarding Plaintiff's letter. (Pl.'s Ex. 24.) The written response is in the form of a letter to Plaintiff, although Defendant Barnhardt testified she did not send it to Plaintiff and that this is just the standard way of drafting such responses. (Pl.'s Ex. 4, Barnhardt Dep. at 66.)

In the few weeks after the rap competition, Defendant Burton was promoted to the Acting Deputy Warden position at TCF. (Defs.' Ex. D, Burton Dep. at 59.) After he was promoted, he spoke with the principal at TCF, Laquita Featherstone, and other program staff about Plaintiff. (*Id.* at 59.) Burton stated that various staff members had concerns about Plaintiff's rigidity, but that he did not investigate any of the complaints because it was not based on recent information. (*Id.* at 56.) Featherstone told Burton that she had reorganized the school schedule at one point, to minimize Plaintiff's contacts with youthful offenders. (*Id.* at 57.) Burton did not memorialize any of these conversations in writing. (*Id.* at 60.) Burton testified that through these conversations, he decided that Plaintiff was not a good fit for the school building. (*Id.* at 57.)

On February 10, 2009, Burton issued a memorandum to Plaintiff reassigning her from her bid position as a school officer to a general corrections officer at TCF. (Defs.' Ex. L.) Defendant Barnhardt testified that the move was not punitive, and that Plaintiff was not disciplined in any way. (Barnhardt Dep. at 113-114, Defs.' Ex. J.) Plaintiff receives the same pay, maintains the same rank, and works on the same shift. (*Id.* at 113.) However, her job assignments now rotate. (*Id.*) And, as set forth above, she no longer has a set schedule, with weekends and holidays off. (Pl.'s Dep. at 10, Pl.'s Ex.

153.)  Plaintiff also testified that her previous position as a school officer was less

dangerous, because it has less contact with the prison population.  (*Id.* at 153-54.)

Defendants rely primarily on two incidents in explaining why Plaintiff was a bad fit

for the school officer position.  In January 2009, Plaintiff had a confrontation with

Featherstone.  Plaintiff was standing in a teacher's classroom when she observed a

prisoner had some paperwork with some gang-related drawings on it.  (Defs.' Ex. A,

Pl.'s Dep. at 45.)  The prisoner was angry and pushed, or slammed, his chair against a

table.  (*Id.*)  The incident happened in front of both Plaintiff and the teacher, and Plaintiff

told the teacher that Plaintiff would write a misconduct ticket for destruction or misuse of

state property over $10.  (*Id.* at 45-46.)   Later, Principal Featherstone approached

Plaintiff and told her it was not Plaintiff's job to write the ticket, but the teacher's job to

write the ticket.  (*Id.* at 45.)  Plaintiff told Featherstone that if Plaintiff's supervisor told

her not to write the ticket, then she would not write the ticket.  (*Id.* at 46.)  Featherstone

asked who Plaintiff's supervisor was, but she apparently never followed up with

Plaintiff's supervisor about the matter.  (*Id.* at 46.)

On January 27, 2009, a Warden's Forum was held, at which elected

representatives from the prison population can present concerns about the facility.

(Defs.' Ex. J, Barnhardt Dep. at 68.).  One or more prisoners complained about Plaintiff.

(Defs.' Ex. K.) Specifically, a complaint was raised that Plaintiff kicked a group of

prisoners out of the music room.  (Barnhardt Dep. at 96-97.)  Barnhardt testified that

kicking prisoners out of the music room creates "unhappy prisoners, and that creates

potential safety and security issues."  (Defs.' Ex. J, Barnhardt Dep. at 96.)  After the

Warden's Forum, Defendant Barnhardt called Defendant Burton to discuss the music

room incident.  (*Id.* at 98-99.)  Lieutenant Robert Harvey investigated the inmate's grievance, and determined that "the officer was correct in the manner in which it was handled."  (Pl.'s Ex. 30.)

Defendant Burton made the decision to reassign Plaintiff, and Defendant Barnhardt supported the decision.  (Defs.' Ex. J, Barnhardt Dep. at 112.)  Defendant Barnhardt denies that the decision to reassign Plaintiff was retaliatory for her October 2008 letters.  (*Id.* at 79.)  She stated that while she was "upset that that information [in the letters] was viewed that way," but that she was not upset or angry with Plaintiff.  (*Id.*)  Neither she nor TCF were negatively affected by the letters.  (*Id.* at 79-80.)

Defendant Burton testified that, prior to the rap competition, he never had any problems with Plaintiff.  (Pl.'s Mot. Br. at Ex. 3, Burton Dep. at 23.)  Plaintiff testified that prior to her October 10, 2008 letters, Defendant Barnhardt was friendly with Plaintiff, but that after the letters, her relationship toward Plaintiff changed.  (Pl.'s Dep. at 151-52.)

In Defendant Burton's career with the department of corrections, he has only been involved with removing someone from a bid position twice.  (Defs.' Mot. Br. at Ex. D, Burton Dep. at 14-15.)  Aside from removing Plaintiff, he also removed "Officer Walker" from the information desk.  (*Id.*)  As with Plaintiff, he removed Walker because he did not believe she was a "good fit."

### III. STANDARD[2]

---

[2] Defendants entitle their motion as one to both dismiss and for summary judgment.  Because the motion was filed after the close of discovery and relies on matters outside the pleadings, the court will treat the motion as one under Federal Rule of Civil Procedure 56.

Under Federal Rule of Civil Procedure 56, summary judgment is proper when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56©. "In deciding a motion for summary judgment, the court must view the evidence in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor." *Sagan v. United States*, 342 F.3d 493, 497 (6th Cir. 2003). "Where the moving party has carried its burden of showing that the pleadings, depositions, answers to interrogatories, admissions and affidavits in the record, construed favorably to the non-moving party, do not raise a genuine issue of material fact for trial, entry of summary judgment is appropriate." *Gutierrez v. Lynch*, 826 F.2d 1534, 1536 (6th Cir. 1987) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)).

The court does not weigh the evidence to determine the truth of the matter, but rather, to determine if the evidence produced creates a genuine issue for trial. *Sagan*, 342 F.3d at 497 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). The moving party discharges its burden by "'showing' –that is, pointing out to the district court– that there is an absence of evidence to support the nonmoving party's case." *Horton v. Potter,* 369 F.3d 906, 909 (2004) (citing *Celotex*, 477 U.S. at 325). The burden then shifts to the nonmoving party, who "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The non-moving party must put forth enough evidence to show that there exists "a genuine issue for trial." *Horton,* 369 F.3d at 909 (citing *Matsushita*, 475 U.S. at 587 (1986). Summary judgment is not

appropriate when "the evidence presents a sufficient disagreement to require submission to a jury." *Anderson*, 477 U.S. at 251-52 (1986).

## IV. DISCUSSION

In order for Plaintiff to establish a claim of First Amendment retaliation, she must show that: (1) she engaged in constitutionally protected speech or conduct; (2) an adverse action was taken against her that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) there is a causal connection between elements one and two–that is, the adverse action was motivated at least in part by her protected conduct. *Scarbrough v. Morgan County Bd. of Educ.*, 470 F.3d 250, 255 (6th Cir. 2006) (citing *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (en banc)).

Whether a plaintiff engaged in protected speech is a question of law for the court. *Nair v. Oakland County Cmty. Mental Health Auth.*, 443 F.3d 469, 478 (6th Cir. 2006) (citing *Brandenburg v. Hous. Auth. of Irvine*, 253 F.3d 891, 897 (6th Cir. 2001)). For purposes of their summary judgment motion, Defendants accept that Plaintiff's letter, or letters, regarding the rap competition constitutes constitutionally protected speech, and focus instead on the remaining two elements of Plaintiff's prima facie case.

### A. Whether Plaintiff Suffered an Adverse Action

Defendants first argue that Plaintiff's reassignment from the school officer bid position cannot, as a matter of law, constitute an adverse action "that would deter a person of ordinary firmness from continuing to engage in that conduct." *Scarbrough,* 470 F.3d at 255. Defendants point out that "it is not necessarily true that every action–no matter how small–is constitutionally cognizable." (Defs.' Br. at 13.) It is true, for example, that "[p]risoners may be required to tolerate more than public employees,

who may be required to tolerate more than average citizens, before an action taken against them is considered adverse." *Thaddeus-X*, 175 F.3d at 398. However, the Sixth Circuit has stated that

> We emphasize that while certain threats or deprivations are so de minimis that they do not rise to the level of being constitutional violations, this threshold is intended to weed out only inconsequential actions, and is not a means whereby solely egregious retaliatory acts are allowed to proceed past summary judgment. Retaliation against a prisoner [or, in this case, a public employee,] is actionable if it is capable of deterring a person of ordinary firmness from exercising his or her right to access the courts.

*Id.*

Defendants assert that Plaintiff's alleged adverse action is too trivial to survive summary judgment. It is undisputed that Plaintiff's reassignment did not result in a loss of pay, a change of shift time, or a drop in rank. Plaintiff was not disciplined as a result of her letters. Rather, the main differences in her job after her reassignment is that she works with a larger number of prisoners and does not have holidays and weekends off as a matter of course. Defendants argue that these differences cannot as a matter of law constitute an adverse action sufficient to "deter a person of ordinary firmness from continuing to engage in that conduct." *Scarbrough,* 470 F.3d at 255.

Sixth Circuit case law does not support Defendants' position. Where the record demonstrates that "being transferred . . . causes Plaintiffs to suffer harm to their reputations . . . and can negatively impact their daily experiences including their commute, coworker friendships, and community relationships," *Leary v. Daeschner*, 349 F.3d 888, 901 (6th Cir. 2003), the Sixth Circuit has held that "involuntary transfer from one job to another is action that 'would likely chill a person of ordinary firmness from continuing to engage in that constitutionally protected activity.'" *Id.* (*quoting Bloch v.*

*Ribar*, 156 F.3d 673, 679 (6th Cir. 1998) (impairment of reputation, humiliation, mental suffering subject to compensatory damages)).  The Sixth Circuit has held that even when the employee suffers no loss in pay or rank, such a transfer can qualify as an adverse action for purposes of retaliation claims.  *Id.*; *see also Boger v. Wayne County*, 950 F.2d 316, 321 (6th Cir. 1991) (where "extreme embarrassment, humiliation, extreme mental anguish, and loss of professional esteem" was alleged, "Plaintiff need not have suffered loss of salary, promotional opportunities, seniority or other monetary deprivations to have a cognizable interest protected by the First Amendment or the equal protection clause.").

As Plaintiff points out, in the Title VII context, the Sixth Circuit has recognized that a transfer which resulted in no change of pay but was "more arduous and 'dirtier'" was an adverse employment action.  *White v. Burlington N. & Santa Fe Ry. Co.,* 364 F.3d 789, 803 (6th Cir. 2004).  In another Title VII case, the Sixth Circuit found at least a genuine issue of fact with respect to whether a nurse's lateral transfer could constitute an adverse action where the nurse's transfer was to another facility where she may have been put into contact with prisoners who had issued threats against her.  *Strouss v. Michigan Dept. of Corr.*, 250 F.3d 336, 343 (6th Cir. 2001).

The court is not persuaded that as a matter of law Plaintiff's involuntary transfer out of the bid position of school officer cannot constitute an adverse action.  A reasonable jury could find that the Plaintiff's involuntary transfer which resulted in, for example, a loss of guaranteed holidays and weekends off, a change in job responsibilities, and a move to a more dangerous position, constitutes an adverse action sufficient to "deter a person of ordinary firmness from continuing to engage in that

conduct." *Scarbrough*, 470 F.3d at 255. Plaintiff has therefore identified sufficient facts to create a triable issue on the second prong of her first amendment retaliation claim.

### B. Whether There is a Causal Connection Between the Protected Speech and the Adverse Action

Defendants next argue that Plaintiff cannot establish a causal connection between her letters and her reassignment in order to meet the third prong of her retaliation claim. A causal connection exists between the adverse action and the protected speech if the speech was "a substantial or motivating factor" in the adverse action. *Hughes v. Region VII Area Agency on Aging*, 542 F.3d 169, 180 (6th Cir. 2008) (quoting *Rodgers v. Banks*, 344 F.3d 587, 596 (6th Cir. 2003)). "Put differently, a plaintiff satisfies the motivation element by showing that the adverse action 'was motivated at least in part' by the protected speech." *Miller v. City of Canton*, 319 F. App'x 411, 419 (6th Cir. 2009) (quoting *Scarbrough*, 470 F.3d at 255). The third part of Plaintiff's First Amendment retaliation claim therefore looks to Defendants' motivation in transferring her. *Hoover v. Radabaugh*, 307 F.3d 460, 467 (6th Cir. 2002). That is, "the employee must 'point to specific, nonconclusory allegations reasonably linking her speech to employer discipline.'" *Rodgers*, 344 F.3d at 602 (quoting *Farmer v. Cleveland Pub. Power*, 295 F.3d 593, 602 (6th Cir. 2002)). "An act taken in retaliation for the exercise of a constitutionally protected right is actionable even if the action would have been proper if taken for a different reason." *Hoover*, 307 F.3d at 467 (citing *Bloch v. Ribar*, 156 F.3d 673, 681-82 (6th Cir. 1998).

In arguing causation, Plaintiff relies primarily on the temporal proximity between her protected activity, writing the letters regarding the rap competition, and her transfer.

Plaintiff's letters were dated October 10, 2008, and she was transferred on February 10, 2009. Defendants argue that the four months between Plaintiff's letters and her transfer makes the temporal proximity insufficient as a matter of law to create an issue of fact on causation.

In *Cooper v. City of North Olmsted*, 795 F.2d 1265 (6th Cir. 1986), the Sixth Circuit found that the "mere fact that [the plaintiff] was discharged four months after filing a discrimination claim is insufficient to support an interference of retaliation" in the Title VII context. *Id.* at 1272. Temporal proximity, insufficient when found standing alone at a remove of some four months, is nonetheless relevant to the causal connection inquiry. *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000) ("Although no one factor is dispositive in establishing a causal connection, evidence that . . . the adverse action was taken shortly after the plaintiff's exercise of protected rights is relevant to causation.") (citing *Moon v. Transport Drivers, Inc.*, 836 F.2d 226, 230 (6th Cir.1987)). In *Nguyen*, the Sixth Circuit observed:

> The specific issue of temporal proximity was addressed in *Harrison v. Metropolitan Government of Nashville*, 80 F.3d 1107 (6th Cir.1996). There, we held that even though one year and three months had elapsed between the filing of the EEOC charge and the plaintiff's termination, that time lapse, when considered in conjunction with the evidence that three other employees who testified on the plaintiff's behalf feared retaliation and the supervisor had made repeated comments that he would not hesitate to run employees out of his department, was sufficient to establish a prima facie case of retaliation. *See id.* at 1119 ("This evidence, taken together with the timetable of Mr. Harrison's EEOC charge and termination, convinces us that the plaintiff established a prima facie case of retaliation.") (emphasis added); *see also Moore v. KUKA Welding Sys.*, 171 F.3d 1073, 1080 (6th Cir. 1999) (holding that the close proximity in time between the adverse action and the protected activity coupled with the evidence of frequent discipline for trivial matters and unwarranted criticism of the plaintiff's work, when viewed as a whole, supported the jury's finding of retaliation).

> In both *Harrison* and *Moore*, we found a causal connection when the temporal proximity was considered along with other evidence of retaliatory conduct.

*Nguyen*, 229 F.3d at 566. *Nguyen* is often cited for the proposition that temporal proximity alone is insufficient to establish a causal link, but *Nguyen* does not support so strict a holding. In *Nguyen*, the court noted that there had been two previous Sixth Circuit decisions, *Cooper* and an unpublished decision,[3] in which the Sixth Circuit had held that temporal proximity was not enough to establish causation. However, the *Nguyen* court also left open the possibility that temporal proximity could, in some circumstances, establish causation under the appropriate factual scenario:

> In *Parnell*, after stating explicitly that temporal proximity in the absence of other evidence of causation is not sufficient to raise an inference of a causal link, we noted that not only had Parnell not presented any such evidence, she had been transferred as part of a reduction-in-force, and the time lag to which she pointed was seven months, which "does not necessarily support an inference of a causal link; previous cases that have permitted a prima facie case to be made based on the proximity of time have all been short periods of time, usually less than six months." *Parnell*, 1997 WL 271751 at *3. And in *Cooper*, which we specifically cited in Parnell, we noted explicitly that the plaintiff had been discharged after leaving her bus unattended, "with children milling around it," and after numerous disciplinary infractions. *Cooper*, 795 F.2d at 1267. *In each of those cases, as in Nguyen's case, the fact of temporal proximity alone was not particularly compelling, because the plaintiff's retaliation case was otherwise weak, and there was substantial evidence supporting the defendant's version of the events. More importantly, however, while there may be circumstances where evidence of temporal proximity alone would be sufficient to support that inference, we do not hesitate to say that they have not been presented in this case.*

*Nguyen*, 229 F.3d at 566-567 (emphasis added).

---

[3] *Parnell v. West*, No. 95-2131, 1997 WL 271751, *2 (6th Cir. May 21, 1997).

Following *Nguyen*, some Sixth Circuit panels have stated that the causal link cannot be based on temporal proximity alone. *Timm v. Wright State University*, 375 F.3d 418, 423 (6th Cir. 2004) ("Eight months is a long period of time for an employer to wait to retaliate against an employee with a termination notice, and the evidence [the plaintiff] presented does not change our perspective in this case."); *see also Holley v. Giles County, Tenn*., 165 F. App'x 447, 452 (6th Cir. 2006) ("Hayward's resignation occurred eleven months after the personal injury suits were filed. Such a long time lag between the speech and the adverse employment action is a strong indication that the action was not retaliatory."). And, conversely, other panels have found a causal link based solely on temporal proximity. *Asmo v. Keane, Inc.*, 471 F.3d 588, 593 (6th Cir. 2006) (finding that termination within two months of learning of plaintiff's pregnancy sufficient evidence to satisfy causal nexus for retaliation); *Singfield v. Akron Metro. Hous. Auth.*, 389 F.3d 555, 563 (6th Cir. 2004) (finding that the temporal proximity of "just over three months" between the protected activity and the adverse action occurring in late January "significant enough to constitute sufficient evidence of a causal connection for the purpose of satisfying [the plaintiff's] burden of demonstrating a prima facie case.").

The court is persuaded that, despite language to the contrary, case law in this circuit allows the causal connection to be found by temporal proximity alone in certain, narrow circumstances. "We have recognized, however, that in some cases temporal proximity may be sufficient to establish causation." *Hamilton v. Gen. Elec. Co.*, 556 F.3d 428, 435 (6th Cir. 2009) (citing *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516,

523-26 (6th Cir. 2008)).  As the court held in *DiCarlo v. Potter*, 358 F.3d 408, 421 (6th

Cir. 2004):

> In fact, this Circuit has embraced the premise that in certain distinct cases
> where the temporal proximity between the protected activity and the
> adverse employment action is acutely near in time, that close proximity is
> deemed indirect evidence such as to permit an inference of retaliation to
> arise. *See, e.g.*, *Brown v. ASD Computing Ctr.*, 519 F. Supp. 1096, 1116
> (S.D. Ohio 1981) ("where there is no direct proof of a retaliatory motive,
> retaliation may be imputed if the timing of the retaliatory act is such as to
> allow an inference of retaliation to arise"), *aff'd sub nom. Brown v. Mark*,
> 709 F.2d 1499 (6th Cir. 1983); *see also Nguyen*, 229 F.3d at 567 (noting
> that there are instances in which "evidence of temporal proximity alone
> would be sufficient to support" an inference of a causal link); *Parnell v.
> West*, No. 95-2131, 1997 WL 271751, at *3 (6th Cir. May 21, 1997) (noting
> that although "[a] time lag of seven months does not necessarily support
> an inference of a causal link[,] previous cases that have permitted a prima
> facie case to be made based on the proximity of time have all been short
> periods of time, usually less than six months").

*DiCarlo*, 358 F.3d at 421 (finding causal link met where 21 days separating protected

activity from adverse action).  As with so many inquiries, the question of whether

temporal proximity is enough to establish causation is a case-specific, highly-factual

determination.  Sixth Circuit case law suggests that temporal proximity may be enough

to establish causation if the events are particularly close in time.

Nonetheless, the court recognizes that there appear to be two lines of cases in

the circuit, one suggesting temporal proximity alone can never establish causation, and

one line suggesting it can.  For example, in *Asmo*, the court specifically stated that

"[t]emporal proximity can establish a causal connection between the protected activity

and the unlawful employment action in the retaliation context," *Asmo*, 471 F.3d at 593,

while in *Jones v. City of Allen Park*, 167 F. App'x 398, 408 (6th Cir. 2006), the court held

that "[t]he mere proximity in time of the allegedly retaliatory act to the plaintiff's exercise

of his constitutional right is not enough to establish causation." As another district court

in Circuit has aptly stated "[t]here appears to be some confusion in the case law on this

issue." *Eppes v. Enter. Rent-A-Car Co. of Tenn.*, No. 3:05-CV-458, 2007 WL 1170741,

*7 (E.D. Tenn. April 18, 2007).

One recent Sixth Circuit decision has attempted to explain the confusion:

> Although recent case law presents as settled the proposition that temporal proximity alone may not establish a causal connection, *see, e.g.*, *Tuttle*, 474 F.3d at 321 ("The law is clear that temporal proximity, standing alone, is insufficient to establish a causal connection for a retaliation claim."), this issue deserves greater attention. The Court in Tuttle cited *Nguyen* to support its assertion that temporal proximity alone is not enough to establish causation, *id.*, but *Nguyen* made no such holding. *See also Dixon v. Gonzales*, 481 F.3d 324, 333-34 (6th Cir. 2007) (*citing Nguyen* for the same holding); *Randolph v. Ohio Dept. of Youth Serv.*, 453 F.3d 724, 737 (6th Cir. 2006) (same); *Little v. BP Exploration & Oil Co.*, 265 F.3d 357, 364 (6th Cir. 2001) (same).

> *Nguyen* noted that "while there may be circumstances where evidence of temporal proximity alone *would* be sufficient to support [the] inference [of retaliatory discrimination], we do not hesitate to say that they have not been presented in this case." 229 F.3d at 567 (emphasis added). Although Nguyen did however note that other earlier cases could be read as having "rejected the proposition that temporal proximity is enough," *id.* at 566 (citing *Cooper v. City of N. Olmsted*, 795 F.2d 1265, 1272 (6th Cir. 1986)), *Nguyen* reads these cases expansively, and none squarely stands for the proposition that temporal proximity alone may never show a causal connection. In *Cooper*, for example, this court simply stated that "[t]he mere fact that *Cooper* was discharged four months after filing a discrimination claim is insufficient to support an interference [sic] of retaliation." 795 F.2d at 1272. That language does not preclude plaintiffs from ever using a temporal proximity closer than four months to establish an inference of retaliation.

> After Nguyen, other cases confronting this issue have often included statements similar to Nguyen's suggestion that in some circumstances "temporal proximity alone would be sufficient." 229 F.3d at 567. For instance, in *DiCarlo v. Potter*, 358 F.3d 408, 421 (6th Cir. 2004), this Court stated that "this Circuit has embraced the premise that in certain distinct cases where the temporal proximity between the protected activity and the adverse employment action is acutely near in time, that close proximity is

deemed indirect evidence such as to permit an inference of retaliation to arise." *See also Asmo v. Keane, Inc.*, 471 F.3d 588, 593 (6th Cir. 2006) ("Temporal proximity can establish a causal connection between the protected activity and the unlawful employment action in the retaliation context."); *McNett v. Hardin Cmty. Fed. Credit Union*, 118 Fed. Appx. 960, 965 (6th Cir. 2004) (finding causation when "only 13 days" separated protected activity from adverse action, reasoning that an "employer's knowledge of the protected activity coupled with an adverse action occurring close in time can create an inference of causation where the particular circumstances strengthen the inference of causation"); *Shefferly v. Health Alliance Plan of Michigan*, 94 Fed. Appx. 275, 285 (6th Cir. 2004) (stating that "the passage of less than three weeks between [the employer's] receipt of the charges and the adverse actions gives rise to an inference of discrimination" and "[t]herefore, in this case, [the plaintiff] has established a prima facie case of retaliation"); *Mallory v. Noble Corr. Inst.*, 45 Fed. Appx. 463, 472-73 (6th Cir. 2002) ( "[T]he fact that retaliation occurs 'very close' in time after a person engages in conduct protected by Title VII may suffice to satisfy the causal connection requirement.") (citing *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001)). Furthermore, one could read the Supreme Court as having accepted that temporal proximity may be sufficient in a narrow set of cases. *See Clark County*, 532 U.S. at 273, 121 S.Ct. 1508 (referencing "cases that accept mere temporal proximity. . . as sufficient evidence of causality to establish a prima facie case" and noting that those cases "uniformly hold that the temporal proximity must be 'very close' ") (citations omitted).

*Mickey,* 516 F.3d at 523-525. In *Mickey*, the panel acknowledged the two seemingly

divergent lines of cases, but explained that they were "fully reconcilable":

> Where an adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of satisfying a prima facie case of retaliation. But where some time elapses between when the employer learns of a protected activity and the subsequent adverse employment action, the employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality. *See Little*, 265 F.3d at 365 ("[T]emporal proximity, when considered with the other evidence of retaliatory conduct, is sufficient to create a genuine issue of material fact as to" a causal connection.).

*Id.* at 525.

The closer in time the adverse action occurs to the protected activity, the more reasonable is the argument that a jury could find, first, that temporal proximity has been proven to exist under the circumstances, and, second, that the proven proximity is "very close" so as to permit it, standing alone, to establish the necessary causal connection.

Here, Plaintiff sent her letters on October 10, 2008, and she was transferred on February 10, 2009.  Although at first glance this time-frame seems identical to the four month lapse rejected in *Cooper*, 795 F.2d at 1265, the facts of the case suggest a shorter effective time lapse than four months.  Defendants were first made aware of Plaintiff's letters on October 21, 2008, and thus the time-frame between Defendants' knowledge of the protected activity and the adverse action is three and a half months, a time-frame which is similar to that which was accepted by the Sixth Circuit as sufficiently significant to prove a causal connection in *Singfield*, 389 F.3d at 563.  In any event, if anything can be learned from the jurisprudence in this area, it is that there is no bright-line rule with respect to whether temporal proximity can be used to establish causation.

In this case, the court finds that Plaintiff has just barely proffered sufficient evidence to allow the jury to make this determination.  While the time lapse in this case is longer than that found significant in *Asmo* or *DiCarlo*, it was relatively short given the context –*i.e.,* the particular facts of this case.  The court bases this determination on the nature of the protected activity and Defendants' delayed notice, the few days it took Defendants to respond to Representative Gonzales's inquiry about the letter,[4] and the fact that the Christmas holiday season as well as a significant change in management

_____

[4]Defendant Barnhardt provided a written response to Representative Gonzales's office regarding Plaintiff's letter on October 24, 2008.    (Pl.'s Ex. 24.)

occurred during this time period, almost certainly inducing some delay in personnel decisions. Because of these factors, the court concludes that the relatively short lapse of time between Plaintiff's protected activity and her subsequent reassignment is enough, on its own, for a reasonable jury to find proximity and from it to infer causation.

Furthermore, while the court holds that the temporal proximity between Plaintiff's letters and her reassignment could be proven and alone satisfy the causal connection prong, there is additional, circumstantial, evidence from which a reasonable jury could infer causation. Specifically, the Sixth Circuit has held that, even where temporal proximity itself is not enough to establish causation, close temporal proximity coupled with heightened scrutiny can establish causation. *See Upshaw v. Ford Motor Co.*, 576 F.3d 576, 588-589 (6th Cir. 2009) (finding causal connection with temporal proximity of 19 months combined with heightened scrutiny). The *Upshaw* court stated:

> We have held that the combination of close temporal proximity between an employer's heightened scrutiny and that plaintiff's filing of an EEOC charge is sufficient "to establish the causal nexus needed to establish a prima facie case" of retaliation. *Hamilton v. Gen. Elec.*, 556 F.3d 428, 436 (6th Cir. 2009) (holding that summary judgment for defendant was inappropriate where plaintiff was subjected to heightened scrutiny a few months after he filed an age-discrimination claim with the EEOC). Here, Upshaw has proffered evidence that Ford subjected her to heightened scrutiny soon after she filed her 2003 EEOC charge. It is undisputed that Hughes-Sharp and Brooks began developing a timeline of Upshaw's employment in fall 2003, and that they requested that other Ford employees submit information about Upshaw's complaints to Human Resources. Ford's heightened scrutiny is evidenced by a December 6, 2004 email from Ford employee Mark Striker to Hughes-Sharp, stating: "I would like to talk to you about this. I would assume that this is the type of documentation that you are interested in with regards to Upshaw. It seems to me that everyone has problems dealing with Upshaw. Something needs to be done with her, or we will have good people leaving, and we will still be dealing with her." (JA 773). An earlier email from Ronald Campbell, another employee, to Hughes-Sharp relaying the details of a dispute between Upshaw and another salaried employee,

stated, "I do know that [Human Resources] is doing some investigations, but I am concerned with the number of different people in the organization that currently have or have had issues with Carolyn. Maybe she needs to be reassigned in the interim?" (JA 167.)  Given the close temporal proximity between Upshaw's August 2003 EEOC charge and Ford's request for information from other employees documenting Upshaw's complaint activity, and Brooks's request for discipline, a reasonable juror could find that Upshaw has established a prima facie case of retaliation.

*Upshaw v. Ford Motor Co.*, 576 F.3d at 588-89 (6th Cir. 2009).  As in *Upshaw,* there is evidence in this case that, after he was promoted, Burton sought out Plaintiff's co-workers to talk about her performance.  Although it is not clear whether Principal Featherstone first approached him or he first approached her, after talking to Featherstone Burton "went and [] talked to some of the other program staff" in order to "get a feel for what was going on."  (Defs.' Ex. D, Burton Dep. at 58.)  He testified that after he was promoted and had contact with Featherstone about Plaintiff, he "would have had a concern, because at that time [he] was in charge of programs."  (*Id.* at 59.) This was, however, in October of 2008, just a few weeks after the rap competition and even closer to the time he found out about Plaintiff's letters.  A reasonable jury could find that the heightened scrutiny of Plaintiff's job performance was caused at least in part by her letters.  Particularly because Burton also testified that prior to the rap competition, he never had any problems with Plaintiff.  (Pl.'s Mot. Br. at Ex. 3, Burton Dep. at 23.)

The court finds the facts in this case to be similar to the facts in *Hamilton v. Gen. Elec. Co.*, 556 F.3d 428, (6th Cir. 2009).  In *Hamilton*, the court explained:

In *Mickey*, we held that "[w]here an adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of satisfying a prima

facie case of retaliation." *Id.* at 525. Hamilton's case, however, does not rest on temporal proximity alone. Instead, Hamilton alleges that his bosses heightened their scrutiny of him after he filed his EEOC complaint. *See Jones v. Potter*, 488 F.3d 397, 408 (6th Cir. 2007) (noting that an employer cannot conceal an unlawful discharge by closely observing an employee and waiting for an ostensibly legal basis for discharge to emerge). On a motion for summary judgment, we view the facts in the light most favorable to Hamilton, and he has testified in his deposition that GE increased its scrutiny of him after he filed his EEOC complaint. The combination of this increased scrutiny with the temporal proximity of his termination occurring less than three months after his EEOC filing is sufficient to establish the causal nexus needed to establish a prima facie case.

*Hamilton*, 556 F.3d at 435-436. Here, as in *Hamilton*, a reasonable jury could find causation based on the relatively short proximity between the letters and Plaintiff's reassignment, combined with Burton's testimony that he questioned her staff members regarding her performance.

The court also finds that a reasonable jury may also consider relevant the fact that Defendants Burton and Barnhardt were the two individuals responsible for responding to Representative Gonzales's letter and were, additionally, the two individuals responsible for making the decision to transfer Plaintiff. Further, there is some evidence that Defendant Barnhardt's relationship with Plaintiff changed after she wrote the letters (Pl.'s Dep. at 151-52), and Barnhardt testified that while she was she was not upset or angry with Plaintiff, she was "upset that that information [in the letters] was viewed that way," (Defs.' Ex. J, Barnhardt Dep. at 79).

Although this case presents a close question, the causation element of Plaintiff's First Amendment retaliation claim looks to Defendants' motivation in transferring her. *Hoover v. Radabaugh*, 307 F.3d 460, 467 (6th Cir. 2002). "When the defendants' intent is at issue, 'summary judgment is particularly inappropriate.'" *Id.* (quoting *Marohnic v.*

*Walker*, 800 F.2d 613, 617 (6th Cir. 1986)).  Viewing the facts in a light most favorable to Plaintiff, the court finds that Plaintiff has identified sufficient facts to prove a prima facie case of retaliation and Defendants are not entitled to summary judgment.

**C.  Whether Plaintiff Would Have Been Transferred in the Absence of the Letters**

Defendants next argue that they are entitled to summary judgment because, even if Plaintiff can meet her prima facie case, Defendants have conclusively shown that they would have made the decision to reassign her even if she had not written the letters.

Once Plaintiff meets her burden of establishing a prima facie case of retaliation, the burden shifts to the employer who "may 'show[ ] by a preponderance of the evidence that it would have reached the same decision . . . even in the absence of the protected conduct.'"  *Rodgers v. Banks*, 344 F.3d 587, 602 (6th Cir. 2003) (quoting *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)).  This latter burden, however, "'involves a determination of fact' and ordinarily is 'reserved for a jury or the court in its fact-finding role.'"  *Id.*  (quoting *Perry v. McGinnis*, 209 F.3d 597, 604 n.4 (6th Cir. 2000)).  Defendants argue they can meet this burden as a matter of law, asserting that they would have reassigned Plaintiff based on "complaints from staff and prisoners about the unnecessarily harsh manner in which she performed her duties as school officer."  (Defs.' Br. at 16.)  Defendants point to the conversations Burton had with staff members, the January incident in the music room, and Featherstone's January incident with Plaintiff regarding whether Plaintiff or a teacher should write up a ticket.

24

The court finds that these proffered reasons do not entitle Defendants to summary judgment. While the jury may ultimately be persuaded that Defendants would have decided to transfer Plaintiff in the absence of the letter, Plaintiff has also identified sufficient evidence on which a reasonable jury could conclude that they would not have transferred Plaintiff were it not for the letters.

First, a reasonable jury could find that Burton would not have inquired of staff members about Plaintiff were it not for the letters. Or, a reasonable jury could conclude that, even if he would have inquired absent the letters, he would not have decided to transfer her based on these few informal conversations he had about Plaintiff with staff members, which were not memorialized in writing, (Defs.' Ex. D, Burton Dep. at 60), and were focused on complaints that were not investigated because they were not based on recent events, (*id.* at 56). Moreover, a reasonable jury could find that the January incidents were trivial,[5] particularly in light of Plaintiff's long history with TCF as a school officer.

Indeed, Plaintiff has attached to her response brief, seven evaluations from TCF, one for each full calendar year she worked as the school officer. (*See* Pl.'s Exs. 4-11.) The evaluations were issued each December and span the years from 2002 (Ex. 4) to 2008 (Ex. 11). All of her evaluations rate her at "ME" (Meets Expectations) or "HP" (High Performing). In the eight evaluations submitted to the court, there are no marks below "ME", nor are there any identified areas of improvement. Instead, all of the

---

[5]With respect to the music room incident, the incident was investigated by Lieutenant Robert Harvey, who determined that "the officer was correct in the manner in which it was handled." (Pl.'s Ex. 30.)

evaluations include positive, or even enthusiastic indications of her job performance. Her 2002 Evaluation, for example, states "Keep up the good work! I also appreciate your professionalism when assigned to the front desk. Thanks for the good job!" (Pl.'s Ex. 5.) Under "Team Work," her 2003 evaluation gives her an "HP" rating and states, "She easily works with all the staff that are assigned to that building. This writer believes she strives to be a member of the school building team. This writer believes she has earned the trust of the other employees she works with on a daily basis." (Pl.'s Ex. 6.) Her 2004 evaluation states, under "Integrity/Honesty," "Officer Mosholder demonstrates excellent work ethics, she also has a high level of integrity and ethical behavior and serves as a model for others." (Pl.'s Ex. 7.) In 2005, under "Communication," her evaluation states that she "has the ability to clearly give and receive information from individuals around her." (Pl.'s Ex. 8.) In 2006, she received an "HP" in "Integrity/Honesty," where her evaluator observed that she "displays a high level of integrity and ethical conduct. She is a positive role model for this department and facility. She consistently demonstrates excellent work ethics. She is highly respected by her co-workers." (Pl.'s Ex. 9.) Similarly, her 2007 evaluation noted, under "Contributing to Team Success," that Plaintiff was a "valued" staff member who "draws from her many years of experience and accumulated knowledge to provide guidance for newer staff members. She is Vice President of the TCF Employee Club. She works very well with coworkers and takes on added responsibility without being asked. She is well respected by coworkers." (Pl.'s Ex. 10.)

Her 2008 evaluation was signed on December 22, 2008, by Defendant Barnhardt, who appears to have written "Good Job" next to her signature. (Pl.'s Ex. 11.)

Plaintiff received a "HP" for "Contributing to Team Success," where her evaluator wrote that Plaintiff "works well with other staff and supervisors.  Ruth understands the importance of working together as a strong team to be successful." (*Id.*)  Similarly, under "Adaptability," her evaluator noted, among other things, that Plaintiff "readily adapts to working with prisoners, programs staff and the public on her different assignments." (*Id.*)  Under "Safety Awareness," her evaluator commented that Plaintiff is "aware of the conditions in her area and the areas around her that affect the safety of herself and others." (*Id.*)  The evaluation continues, stating that Plaintiff "will attempt to correct issues as they come along so as to prevent them from becoming a safety issue however if the issue is larger than her scope of authority Ruth will bring the issue to her supervisors awareness."

In light of these evaluations, which consistently rate Plaintiff at or above expectation, and which specifically identify safety and teamwork as areas in which she is effective, a reasonable jury could conclude that Defendants' identified bases for reassigning Plaintiff would not have been sufficient, in the absence of her protected activity, to uproot Plaintiff from her bid position and transfer her to an unwanted position. The court thus finds that a jury question exists on whether Defendants would have made the decision to transfer her in the absence of her letters.  Defendants' motion for summary judgment will be denied.

## V.  CONCLUSION

IT IS ORDERED that Defendants' "Motion to Dismiss and/or [for] Summary

Judgment" [Dkt. # 11] is DENIED.


      S/Robert H. Cleland
      ROBERT H. CLELAND
      UNITED STATES DISTRICT JUDGE

Dated:  February 12, 2010

I hereby certify that a copy of the foregoing document was mailed to counsel of record
on this date, February 12, 2010, by electronic and/or ordinary mail.

      S/Lisa Wagner
      Case Manager and Deputy Clerk
      (313) 234-5522


S:\Cleland\JUDGE'S DESK\C3 ORDERS\09-11829.MOSHOLDER.Dismiss.SJ.FirstAmendmentRetaliation.chd.2.wpd